**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

VERNIE E. TALKINGTON,

        Plaintiff,

vs.

JO ANNE B. BARNHART,
Commissioner of Social Security,

        Defendant.

No. C04-3053-PAZ

**MEMORANDUM OPINION
AND ORDER**

_____

*TABLE OF CONTENTS*

*I.*    *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

*II.*   *PROCEDURAL AND FACTUAL BACKGROUND* . . . . . . . . . . . . . . . . . . . **2**

    *A.*   *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**
    *B.*   *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **3**
        *1.*   *Introductory facts and the Talkingtons' hearing testimony* . . . . . . **3**
        *2.*   *Talkington's medical history* . . . . . . . . . . . . . . . . . . . . . . . . **6**
        *3.*   *Vocational Expert's testimony* . . . . . . . . . . . . . . . . . . . . . . . **6**
        *4.*   *The ALJ's decision* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

*III.*  *DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND
      THE SUBSTANTIAL EVIDENCE STANDARD* . . . . . . . . . . . . . . . . . . . . **16**

    *A.*   *Disability Determinations and the Burden of Proof* . . . . . . . . . . . . . **16**
    *B.*   *The Substantial Evidence Standard* . . . . . . . . . . . . . . . . . . . . . . **19**

*IV.*  *ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

*V.*   *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

## I. INTRODUCTION

The plaintiff Vernie E. Talkington ("Talkington") appeals a decision by an administrative law judge ("ALJ") denying her applications for Title II disability insurance ("DI") and Title XVI supplemental security income ("SSI") benefits. Talkington claims the ALJ erred in rejecting the opinions of one of her treating physicians and of the psychologist to whom she had been sent by the Social Security Administration. She also claims substantial evidence in the Record compels a finding that she is disabled. (*See* Doc. No. 7)

## II. PROCEDURAL AND FACTUAL BACKGROUND

### A. Procedural Background

On April 3, 2002, Talkington protectively filed applications for DI and SSI benefits alleging a disability onset date of March 29, 2002. (R. 96-98, 573-78) Talkington alleged she was disabled due to "[a]nxiety attacks in crowds, short of breath, dizzieness [sic], heart rate speeds up, can feel heart beat in head." (R. 114) She stated her condition limited her ability to work because she was unable to focus on one thing for very long, and she suffered from dizziness, trembling, paranoia, and anxiety. (*Id.*) Her applications and requests for reconsideration were denied. (R. 77-82, 85-88, 579-88)

Talkington requested a hearing (*see* R. 83), and a hearing was held before ALJ Robert Maxwell on October 7, 2003, in Spencer, Iowa. (R. 37-76) Talkington was represented at the hearing by attorney David Scott. Talkington and her husband, Leroy Talkington, testified at the hearing. Vocational Expert ("VE") William Tucker also testified.

On February 10, 2004, the ALJ ruled Talkington was not entitled to benefits. (R. 10-29) Talkington appealed the ALJ's ruling, and on May 13, 2004, the Appeals

Council denied Talkington's request for review (R. 5-7), making the ALJ's decision the final decision of the Commissioner.

Talkington filed a timely Complaint in this court, seeking judicial review of the ALJ's ruling. (Doc. No. 2) The parties filed a consent to jurisdiction and final disposition of this case by the undersigned U.S. Magistrate Judge, and on August 5, 2004, the case was transferred to the undersigned. (Doc. No. 3) Talkington filed a brief supporting her claim on October 20, 2004. (Doc. No. 7) The Commissioner filed a responsive brief on December 17, 2004. (Doc. No. 8).

The matter is now fully submitted, and pursuant to 42 U.S.C. § 405(g), the court turns to a review of Talkington's claim for benefits.

## B. Factual Background

### 1. Introductory facts and the Talkingtons' hearing testimony

At the time of the hearing, Talkington was thirty-five years old. She lived in Curlew, Iowa, with her husband Leroy and their two children, ages thirteen and five. She is able to read and write, but only finished the tenth grade, and did not obtain a GED. At the time of the hearing, she was 5'4" tall and weighed 277 pounds. She smokes a pack of cigarettes a day.

Talkington last worked on March 28, 2002, when she was fired from a job working in a mobile home plant in Georgia. She first worked at the plant from 1995 to 1998. She worked as an escort driver from 1999 to 2001; then as a cook in a café for six months in 2001; and then she returned to work at her job in the mobile home plant until she was fired. Talkington explained that in January 2002, "everything just exploded." (R. 56) Shortly before Talkington was fired, someone broke into her house, and she began to have repeated anxiety attacks. According to Talkington, she was fired because of her anxiety

attacks and because she "couldn't stand being around a bunch of people," although her employer told her she was fired because she was not fulfilling her job duties by missing too much work.

Talkington did not seek unemployment benefits because she did not feel she was able to work. She has not worked since she was fired by the mobile home plant.

Talkington stated she was diagnosed with an anxiety disorder around the time she was fired. When she has an anxiety attack, it causes her to tremble noticeably, which she has trouble controlling. In Georgia, Talkington was evaluated by Dr. Douglas Payne, a clinical psychologist. She moved away from Georgia to "get away from everybody," stating she cannot stand to be around people and just wants to be by herself. (R. 44) She and her husband chose Curlew, Iowa, as their new home because her brother lived in the area and her husband had obtained employment in a nearby community. After moving to Iowa, Talkington sought mental health counseling from Dr. Anhim Bashir at the Seasons Center in Spencer, Iowa. Talkington testified medication prescribed by Dr. Bashir reduced the frequency and severity of her anxiety attacks. Before starting the medication, she had had serious episodes of hyperventilation from her anxiety attacks at least once a month, sometimes to the extent that she would lose consciousness. Since taking the medication, she has not lost consciousness, but she continues to have tremors and cold sweats. She has never been hospitalized for mental health reasons.

Talkington testified that about six months before the hearing, her primary care physician, Dr. Patricia Banwart, diagnosed her as suffering from diabetes. Dr. Banwart tried to regulate the diabetes with pills but was unsuccessful, and Talkington started retaining fluids and her feet swelled significantly. About a month before the hearing, Dr. Banwart hospitalized Talkington to put her on insulin and regulate her dosage. During her three-day stay in the hospital, the swelling in her feet went down and she lost

sixteen pounds.  After her discharge from the hospital, she continued to suffer from swelling in her feet.  The skin cracked and her feet were painful.  She testified she was told to keep her feet elevated as much as possible.

Talkington stated she has a disc herniation in her back at L5-S1.  Because of this condition, her hips hurt when she walks, bends, or stoops, and the pain goes up to her neck and down into her legs.  She does not take any medication for these problems.

Talkington has a history of problems with heart rhythm, pace, and rate, but they are controlled by medication.  She also has chronic obstructive pulmonary disease, which she controls with pills and inhalers, but the condition causes shortness of breath with physical activity.  About once a week, she has migraines from her anxiety.  When she has these headaches, she takes medication and goes to bed.

Talkington has a driver's license and can drive.  She cannot walk for a block without having to sit down because of pain in her hips and her feet and because of breathing difficulties.  She can only climb a few stairs at a time.  She testified she is not able to do any work that would require her to be on her feet or to interact with the public.  Specifically she would not be able to do the "cook/helper" job she held at the café because it would involve dealing with people.  She stated she is not able to cook even at home.

Leroy Talkington testified he has lived with his wife for 14 years, and they have been married for 10 years.  He believes she is not capable of going into the workplace and performing a job.  He stated she is unable to walk any distance.  He testified "she can't hold out and do nothing and she forgets what she's doing sometimes.  And just she'll all be here sitting talking with you one minute and the next minute she be who knows where."  (R. 64)  He also testified that she "can't stand to be around any kind of crowd at all."  (*Id.*)

According to Mr. Talkington, his wife has trouble keeping track of her medications. She can drive a car, but does not drive much. He testified that until she was put on medication about a month before the hearing, his wife would hyperventilate a couple of times a week, sometimes passing out. He was unsure if her back pain was under control, but she still suffers from shortness of breath. She also still experiences tremors.

### 2.    *Talkington's medical history*

The court has reviewed Talkington's medical records thoroughly. Because a detailed discussion of Talkington's medical history is not required to address her assertions of error as to the ALJ's opinion, the court will omit such a discussion here for purposes of brevity. The court will discuss applicable portions of the medical records later in this opinion.

### 3.    *Vocational expert's testimony*

VE William B. Tucker testified he reviewed Talkington's work history, and determined she has acquired no skills from her past work that would be transferrable to other occupations. The ALJ asked the VE the following hypothetical question:

> Assume that you're dealing with an individual under 50, where she would be underage, tenth grade formal education, no GED. Has a work history as you've summarized. Has medically determinable impairment that causes the same work related limitations described in the testimony here today. What's the vocational effect of giving full weight and credibility to that testimony?

(R. 70-71) The VE responded the individual would not be able to work on a full-time basis. (R. 71)

The ALJ then asked the VE the following question:

> Let's look at the state agency assessment and tell us again
> what the vocational effect of those assessments are and the
> age, education, and the work experience is the same as in
> question one. . . . [W]hat if the person could occasionally
> lift and carry 50 pounds, frequently 25 pounds, could stand,
> walk or sit about six hours of eight, push/pull is unlimited, no
> postural limits, no manipulative, visual, and environmental
> limitations. This is light and medium sedentary work. . . .
> Thus far are there jobs you feel she could do?

(R. 71) The VE responded, "Yes." (R. 72)

The ALJ continued:

> Let's add an additional limitation that has to do with the
> ability to make personal, social, and occupational adjustments
> to the job setting. . . . From a mental standpoint, but not
> significant with a marked limitation -- assume no areas of
> marked limitations. There are moderates in . . . dealing with
> maintaining attention and concentration for extended periods
> of time and performing activities within a schedule,
> maintaining regular attendance and being punctual, and also
> carrying out detailed instructions. Those are all three
> moderates. There's a moderate in . . . dealing with com-
> pleting a normal workday and workweek without interruption
> from psychological[ly] based symptoms and performing in a
> consistent pace without an unreasonable number of rest
> periods. And then lastly, there's a moderate limitation in
> interacting appropriately with the general public. If all other
> areas are not significantly limited, would you expect the
> person to be able to meet the minimal demands of medium
> work?

(R. 72) The VE again responded, "Yes." (*Id.*) When asked if the hypothetical person

could perform any of Talkington's past jobs, the VE stated, "I would think that the escort

vehicle job would be within the parameters. The other jobs are classified as semi-skilled

and skilled and I think that the limitations, the moderate limitations added on to the last hypothetical would eliminate any kind of skilled or semi-skilled work." (*Id.*) When asked, "And what kind of range of unskilled work[] is left were you not dealing with the public," the VE replied, "I would think that 75 percent remain." (R. 73)

The ALJ then asked the VE the following hypothetical question:

> [S]he could understand and carry out simple instructions. She is unable to understand and carry out complex instructions. Ability to, I think it should read, get along or get along with other supervisors and coworkers is impaired. Ability to follow work routine and complete production expectations is impaired. Her concentration is satisfactory and [she] would become more anxious under stressful conditions. What affect [sic] would that have on past work or other work?

(*Id.*) The VE responded as follows:

> It probably would eliminate probably her past work with the possible exception of the escort vehicle driver for the same reasons as given before. It's a little hard to know. Your indication is that it's impaired and the extent to which it's impaired I guess is not quite clear. I would think that if it's not a major impairment that she would be able to do simple routine repetitive kinds of work activities.

(*Id.*)


### 4.    *The ALJ's decision*

The ALJ found Talkington's work constituted substantial gainful activity until March 29, 2002, her alleged disability onset date. According to the ALJ, the clinical evidence supports the presence of the following medically determinable impairments:

> There is a clinical history of Wolff-Parkinson-White (W-P-W) syndrome status post multiple ablations, with associated histories of mitral valve insufficiency and hypertension.

There are clinical entries of obesity, recently diagnosed type 2 diabetes mellitus, and mild degenerative disc disease at L5-S1 with herniation at L5-S1. Podiatry records reveal a course of treatment for extensor tendonitis of the right foot. Finally, there is current working diagnosis of post traumatic stress disorder (PTSD), and testing reveals scores placing the claimant at the borderline level of intellectual functioning.

(R. 17) The ALJ accepted that the W-P-W syndrome, the disc disease/herniation at L5-S1, the anxiety disorder, and the borderline intellectual functioning result in more than minimal limitations on Talkington's physical and mental ability to perform basic work activity, and therefore those impairments are severe.[1]  (*Id.*)  The ALJ found, however, that these impairments did not meet the requirements of the regulatory "listings." (R. 17-18)

The ALJ began his review of Talkington's medical history by referencing the records of A. Gordon Boone, M.D., a family practitioner from whom Talkington had received her primary medical care in Georgia. According to the ALJ, Dr. Boone's records for the period from February 2001 through October 2002, contain no mention of any functional restrictions on Talkington's ability to work. Dr. Boone referred Talkington to Darrel Collins, D.O. for a cardiac evaluation, which was conducted on September 16, 2002. According to Dr. Collins, Talkington was doing well from a cardiac standpoint, and her W-P-W was stable. Dr. Collins placed no functional limitations on her capacity to work. Karuna D. Reddy, M.D. treated Talkington for panic disorder. Dr. Reddy's progress notes from March 2002 through October 2002, contain no discussion of Talkington's capacity for work, although on March 28, 2002,

---

[1] The ALJ also found Talkington's diabetes, obesity, COPD/asthma, and tendonitis of the right foot were not severe. (R. 18-19)

Dr. Reddy noted Talkington had returned to work for three hours, asked her boss if she could leave, and was told not to return.

After moving to Iowa, Talkington was hospitalized in September 2003, for metabolic alkalosis. She was released with no functional restrictions. Talkington's treating physician in Iowa, P.A. Banwart, D.O., wrote a letter to Talkington's attorney on October 2, 2003, in which Dr. Banwart "discussed the claimant's diabetes, obesity, degenerative disc disease with herniation and chronic obstructive pulmonary disease." (R. 21) Dr. Banwart stated, "[A]lthough the claimant has multiple disease entities, it does not appear that any one of these would actually qualify her for a disability ruling." (*Id.*) Dr. Banwart advised that Talkington's impairments "perhaps qualify the claimant for a disability ruling if taken together, but the physician left this to the judgment of lawyers and judges." (*Id.*)

Douglas S. Payne, Ph.D., a Social Security consulting psychologist, evaluated Talkington on June 25, 2002. He assessed her as having panic disorder and generalized anxiety disorder, with borderline level of intellectual functioning. He concluded she is able to understand and carry out simple, but not complex, instructions. She is impaired in her ability to get along with the public, supervisors, and coworkers, and in her ability to follow a work routine and complete production expectations. Her concentration is satisfactory, although she would become more anxious under stressful conditions.

The ALJ noted that at the time of the hearing, Talkington was receiving counseling from Mary Aschenbrenner, a mental health social worker. Ms. Aschenbrenner's reports contained no discussion of Talkington's mental capacity for work. Talkington also was under the psychiatric care of Anjum Bashir, M.D. Progress reports by Dr. Bashir through September 2003, contain no comment regarding functional restrictions or Talkington's capacity for work. On January 21, 2003, Talkington saw Michael Moeller,

M.D. for a psychiatric evaluation. In his report, Dr. Moeller also did not comment on any functional restrictions or on Talkington's capacity for work.

A Social Security medical consultant conducted a review of Talkington's medical records in December 2002, and assessed that physically, she should be capable of lifting and carrying 50 pounds occasionally and up to 50 pounds frequently. She should be capable of standing, walking, and sitting, with normal breaks, for about six hours in an eight-hour day. She should be unlimited with respect to pushing and pulling. She has no postural, manipulative, visual, communicative, or environmental limitations.

A Social Security psychological consultant conducted a review of the record in December 2002, and acknowledged Talkington's borderline intellectual functioning and anxiety disorder. The psychologist concluded Talkington "would be moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and interact appropriately with the general public." (R. 22)

From the record, the ALJ concluded Talkington retains "the residual functional capacity to perform work at the medium exertional level, provided the job tasks are simple and repetitive in nature, and provided that the job does not require contact with the general public." (R. 22) He rejected Dr. Payne's assessment to the extent it might imply that Talkington is totally unable to work. The ALJ observed Dr. Payne's use of the term "impaired" properly reflected that Talkington has limitations in certain areas, but the Record does not support a conclusion that Talkington is totally unable to function in these areas.

The ALJ also reviewed the testimony of Talkington and her husband under the standards set out in *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984).[2] He noted Talkington's past work record is not impressive in terms of the amount of earnings reported. During several years when she reported that she was working full time, she was making less than $4,000 a year. He also noted there is some question regarding her job termination in March 2002, because although she stated she was terminated due to impairment-related absenteeism, she used the term "quit" at one point in her testimony. (R. 23, 54)

Regarding Talkington's daily activities, the ALJ found as follows:

> The undersigned cannot establish from this record that the claimant's level of daily activities has been totally compromised by pain or other symptoms at all times since the alleged onset date. In her earlier reports to the Administration, the claimant stated that she rested on a daily basis for one to two hours, however she was performing household chores and some yard work. She reported that she would see friends on a weekly basis and go camping approximately once each month. She reported that she and a sister-in-law attended yard sales and went to a tanning salon. . . . In a later report from November 2002, the claimant stated that she required help in some areas of personal care, such as getting in and out

---

[2] The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:

  1) the claimant's daily activities;
  2) the duration, frequency and intensity of the pain;
  3) precipitating and aggravating factors;
  4) dosage, effectiveness and side effects of medication;
  5) functional restrictions.

*Polaski*, 739 F.2d 1320, 1322 (8th Cir. 1984).

of the tub due to shortness of breath. She advised that, on bad days, she stayed in her pajamas all day. She advised that she did no cooking on three to four days per week, and that her shopping was becoming less frequent and she would do so only [if] accompanied by her mother or husband. . . . The claimant's earlier report to the Administration is not inconsistent with her report to a psychologist in June 2002, whereupon the claimant noted that she spent most of her time fishing with her husband. She noted that she went to a park once each week and participated in a hobby twice a month. She stated she visited friends weekly, and she and her husband jointly visited friends and family on a weekly basis. She also reported that she spent time cleaning the house and mowing the yard. She advised that she participated in activities with friends and family such as cookouts and playing cards every two or three weeks . . . . Important to the undersigned is the fact that her later report to the Administration, i.e., that she needed help with personal care items and frequently was not cooking and so forth, does not appear to be corroborated in this record. It is significant to the undersigned that the claimant's testimony did not include a discussion of her daily activities, either at present or dating to March 2002. Neither the claimant nor her husband testified to her need for help with personal care items or activities such as getting in and out of the tub. To a mental health counselor on April 8, 2003, the claimant described having driven nearly 1,300 miles to visit family and attend a wedding in Georgia. . . . On that same date, the claimant told the counselor of her intention to start going to bingo on Mondays, and that she and her sister-in-law were planning to go to a wellness center weekly and increase their visits thereafter. . . . This goes against accepting that the claimant cannot function outside of her home or that daily activities are already so compromised by pain, shortness of breath and anxiety as to leave little or no room for other responsibilities or activities.

(R. 24)

The ALJ found Talkington's testimony regarding the duration, frequency, and intensity of her symptoms, such as pain, shortness of breath, and anxiety attacks, to be generally inconsistent with the record as a whole. For example, she complains of back pain radiating to both hips and up her back to her neck, but Dr. Banwart, in her letter of October 2003, noted Talkington's back pain had resolved with epidural blocks. Talkington and her spouse testified she suffers from uncontrolled shortness of breath, but Dr. Banwart stated Talkington's obstructive pulmonary disease, secondary to smoking, is under good control with inhalers and Talkington suffers from no shortness of breath. Talkington testified her diabetes causes her feet to be painful, and she can gain no relief unless she props up her feet. In her letter, Dr. Banwart did not mention persistent foot pain or a need for Talkington to keep her feet elevated. Talkington testified about weekly migraines, but Dr. Banwart did not mention migraines in her letter. Talkington focused her testimony on anxiety and related tremors, and the fact that she is unable to deal with people. The ALJ accepted the claim that Talkington endures some anxiety, but he found the severity of her claims was not supported in the medical record. Tremors are not mentioned in the objective evidence, other than a notation that her leg was "jittering" and that she would shake her legs continuously. Her current treating psychiatrist makes no mention of tremors or shakiness in any extremity, and Dr. Banwart did not mention tremors or shakiness in her letter. The ALJ also found Talkington's testimony that she cannot be around other people to be inconsistent with the objective evidence. In April 2003, Talkington was making plans to play bingo and go to a wellness center on a weekly basis. In August 2003, she reported that she entertained company, and on August 26, 2003, her mental health counselor noted Talkington was doing volunteer work, and was exploring other things she could do in the community. The ALJ found this evidence "go[es] against accepting that anxiety attacks are frequent and preclude the claimant from

successfully functioning around other people." (R. 25) He concluded the testimony as a whole was unsupported by the objective record.

In considering precipitating and aggravating factors, the ALJ accepted that Talkington cannot deal with large numbers of people on a frequent basis, and she may experience discomfort in her back and feet relating to her back impairment and diabetes. The ALJ noted, however, that Talkington's treating physician made it clear Talkington's weight, cigarette smoking, and marijuana use aggravated these problems. The ALJ also noted Dr. Bashir indicated throughout his 2003 progress reports that, with respect to her anxiety, Talkington did better when she took her medications and refrained from using marijuana. The ALJ concluded the primary precipitating factors with respect to Talkington's physical complaints were her weight and her smoking, "both of which are within her ability to control." (R. 25) He also concluded her anxiety symptoms were heightened further by her use of marijuana, which she also can control. Finally, he concluded medications are effective in controlling her problems, without side-effects, when taken as directed and not commingled with other agents, such as marijuana.

In considering Talkington's functional restrictions, the ALJ noted no objective evidence supports Talkington's claim that she cannot sustain activity on her feet. Although she had a significant bout of edema in September 2003, the condition was treated successfully with minimal residuals. Her claim that standing, walking, and stair climbing produces shortness of breath is contradicted by her treating physician, and is inconsistent with the fact that she engages in activities such as camping. The ALJ also noted that although Talkington functions intellectually at the borderline level, there is no objective evidence to support significant memory difficulties, as claimed by Talkington. The ALJ observed that Talkington's testimony that Dr. Banwart had advised her to elevate her feet as often as possible was not reflected in Dr. Banwart's letter. Similarly,

the ALJ observed that Talkington's testimony that Dr. Bashir advised her she could not work was not supported by the doctor's records, which contain no admonitions against work.

The ALJ found, after considering the entire record, that Talkington "retains the physical capacity to perform work which does not require lifting/carrying of greater than 50 pounds occasionally or greater than 25 pounds frequently, and she retains the mental capacity to perform work which is simple and repetitive in nature, and does not require contact with the general public." (R. 26) He further found she is capable of performing her past relevant work as an escort vehicle driver, a job she had performed as substantial gainful activity withing the preceding fifteen years for a long enough period for her to have become proficient in the job. (R. 26) Because she retains the residual functional capacity to perform past relevant work, the ALJ found Talkington was not disabled within the meaning of the Social Security Act. As a result, he concluded Talkington was not disabled as of March 29, 2002, or at any time through the date of his decision.

### III. DISABILITY DETERMINATIONS, THE BURDEN OF PROOF, AND THE SUBSTANTIAL EVIDENCE STANDARD

#### A. Disability Determinations and the Burden of Proof

Section 423(d) of the Social Security Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work

which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 432(d)(2)(A).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520 & 416.920; *Goff v. Barnhart*, ___ F.3d. ___, ___, 2005 WL 2086753 (8th Cir. Aug. 31, 2005); *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003); *Kelley v. Callahan*, 133 F.3d 583, 587-88 (8th Cir. 1998) (citing *Ingram v. Chater*, 107 F.3d 598, 600 (8th Cir. 1997)). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon*, 353 F.3d at 605; *accord Lewis v. Barnhart*, 353 F.3d 642, 645 (8th Cir. 2003). *See Bowen v. Yuckert*, 482 U.S. 137, 140-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d 119 (1987) (defining ability to do basic work activity) (citing 20 C.F.R. §§ 404.1521(b), 416.921(b))

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, or work experience. 20 C.F.R. § 404.1520; *Kelley*, 133 F.3d at 588.

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's residual functional capacity ("RFC") to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past

relevant work. 20 C.F.R. §§ 404.1520(4)(iv); 404.1545(4); *see Lewis*, 353 F.3d at 645-46 ("RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, 'what the claimant can still do' despite his or her physical or mental limitations.") (citing *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987); 20 C.F.R. § 404.1520(e) (1986)); *Dixon, supra.* The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. § 404.1545(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. 20 C.F.R. § 404.1520(4)(iv).

Fifth, if the claimant's RFC as determined in step four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner "to prove that there is other work that [the claimant] can do, given [the claimant's] RFC [as determined at step four], age, education, and work experience." Clarification of Rules Involving Residual Functional Capacity Assessments, etc., 68 Fed. Reg. 51,153, 51,155 (Aug. 26, 2003). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Id.*; 20 C.F.R. § 404.1520(4)(v); *Dixon, supra*; *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001) ("[I]f the claimant cannot perform the past work, the burden then shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.") (citing *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998)); *Nevland v. Apfel*, 204 F.3d 853, 857

(8th Cir. 2000). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find the claimant is disabled. 20 C.F.R. § 404.1520(r)(v). At step five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Goff*, 2005 WL 2086753 at 3 (citing *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004)).

### B. The Substantial Evidence Standard

The court reviews an ALJ's decision to determine whether the ALJ applied the correct legal standards, and whether the factual findings are supported by substantial evidence on the record as a whole. *Hensley v. Barnhart*, 352 F.3d 353, 355 (8th Cir. 2003); *Banks v. Massanari*, 258 F.3d 820, 823 (8th Cir. 2001) (citing *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000)); *Berger v. Apfel*, 200 F.3d 1157, 1161 (8th Cir. 2000) (citing 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)). This review is deferential; the court must affirm the ALJ's factual findings if they are supported by substantial evidence on the record as a whole. *Id.* (citing *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002); *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000)); *Kelley v. Callahan*, 133 F.3d 583, 587 (8th Cir. 1998) (citing *Matthews v. Bowen*, 879 F.2d 422, 423-24 (8th Cir. 1989)); 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."). Under this standard, "[s]ubstantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Krogmeier, id.*; *Weiler v. Apfel*, 179 F.3d

1107, 1109 (8th Cir. 1999) (citing *Pierce v. Apfel*, 173 F.3d 704, 706 (8th Cir. 1999));
*accord Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citing *Craig v. Apfel*, 212
F.3d 433, 436 (8th Cir. 2000)); *Hutton v. Apfel*, 175 F.3d 651, 654 (8th Cir. 1999);
*Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993).

Moreover, substantial evidence "on the record as a whole" requires consideration
of the record in its entirety, taking into account both "evidence that detracts from the
Commissioner's decision as well as evidence that supports it." *Krogmeier*, 294 F.3d at
1022 (citing *Craig*, 212 F.3d at 436); *Willcuts v. Apfel*, 143 F.3d 1134, 1136 (8th Cir.
1998) (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488, 71 S. Ct. 456,
464, 95 L. Ed. 456 (1951)); *Gowell*, 242 F.3d at 796; *Hutton*, 175 F.3d at 654 (citing
*Woolf*, 3 F.3d at 1213); *Kelley*, 133 F.3d at 587 (citing *Cline v. Sullivan*, 939 F.2d 560,
564 (8th Cir. 1991)). The court must "search the record for evidence contradicting the
[Commissioner's] decision and give that evidence appropriate weight when determining
whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d
549, 555 (8th Cir. 2003) (also citing *Cline*, *supra*).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply
a balancing test to assess any contradictory evidence. *Sobania v. Secretary of Health &
Human Serv.*, 879 F.2d 441, 444 (8th Cir. 1989) (citing *Steadman v. S.E.C.*, 450 U.S.
91, 99, 101 S. Ct. 999, 1006, 67 L. Ed. 2d 69 (1981)). The court, however, does not
"reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v.
Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record *de novo*." *Roe
v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188
(8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible
to draw two inconsistent positions from the evidence and one of those positions represents
the agency's findings, [the court] must affirm the [Commissioner's] decision." *Id.*

(quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992), and citing *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989)); *accord Baldwin*, 349 F.3d at 555; *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994) (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)); *accord Krogmeier*, 294 F.3d at 1022 (citing *Woolf*, 3 F.3d at 1213). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Goff*, 2005 WL 2086753 at *2 ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion."); *Baldwin*, 349 F.3d at 555 (citing *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997)); *Young*, 221 F.3d at 1068; *see Pearsall*, 274 F.3d at 1217; *Gowell*, 242 F.3d at 796; *Spradling v. Chater*, 126 F.3d 1072, 1074 (8th Cir. 1997).

On the issue of an ALJ's determination that a claimant's subjective complaints lack credibility, the Sixth and Seventh Circuits have held an ALJ's credibility determinations are entitled to considerable weight. *See, e.g., Young v. Secretary of H.H.S.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshier v. Bowen,* 831 F.2d 687, 690 (7th Cir. 1987)); *Gooch v. Secretary of H.H.S.,* 833 F.2d 589, 592 (6th Cir. 1987), *cert. denied*, 484 U.S. 1075, 108 S. Ct. 1050, 98 L. Ed. 2d 1012 (1988); *Hardaway v. Secretary of H.H.S.,* 823 F.2d 922, 928 (6th Cir. 1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit a claimant's subjective allegations of pain, discomfort or other disabling limitations simply because there is a lack of objective evidence; instead, the ALJ may only discredit subjective complaints if they are inconsistent with the record as a whole. *See Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994); *see also Bishop v. Sullivan,*

900 F.2d 1259, 1262 (8th Cir. 1990) (citing *Polaski v. Heckler,* 739 F.2d 1320, 1322 (8th Cir. 1984)[3]).

## IV. ANALYSIS

Talkington's entire argument in this case is based her assertion that the ALJ discounted the opinions of Dr. Payne, a licensed clinical psychologist who evaluated Talkington for the Social Security Administration on June 25, 2002 (R. 267-272), and Dr. Reddy, who treated Talkington for panic disorder from March 2002 through October 2002 (R. 436-46). (*See* Doc No. 7, pp. 3-6) Talkington argues the records of Drs. Payne and Reddy establish that she is disabled.

The ALJ found Dr. Payne's report was not adequate to support a finding of disability. Dr. Payne's prognosis and assessment were as follows:

> Ms. Talkington last worked March 28, 2002 installing molding at Fleetwood Factory and was fired, because she had to take time off work for her anxiety attacks. She has panic disorder without agoraphobia, generalized anxiety disorder, and borderline intellectual functioning. Her prognosis would be guarded. She is able to understand and carry out simple instructions. She is unable to understand and carry out complex instructions. Her ability to [get] along with the public, supervisors, and co-workers is impaired. Her ability to follow a work routine and complete production expectations is impaired. Her concentration is satisfactory. She would become more anxious under stressful conditions. She is able to manage her benefits.

(R. 371) The ALJ concluded that in stating Talkington was "impaired," Dr. Payne was only saying Talkington has limitations in certain areas, not that she is unable to work at

---

[3]*See* note 1, *supra.*

all. The VE testified the degree of "impairment" referenced by Dr. Payne was unclear and the court agrees. The ALJ had to assume, for purposes of his hypothetical question, that Talkington has "no areas of marked limitations." (R. 72) The Eighth Circuit has held it is impermissible for an ALJ to "draw upon his own inferences from medical reports." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (citations, quotation marks omitted). Without drawing upon his own inferences, the ALJ could not have made a determination that Talkington is able to return to her past relevant work as an escort vehicle driver.

With respect to Dr. Reddy's notes, Talkington points out that over a seven-month period in 2002, she repeatedly saw Dr. Reddy with complaints relating to anxiety and panic. The ALJ considered this history and concluded, correctly, that Dr. Reddy's notes contain no discussion of Talkington's capacity for work. That conclusion is accurate, but it begs the question of why the ALJ did not further develop the record to obtain an opinion from this treating mental health professional regarding how Talkington's mental limitations would affect her ability to work. *Id.*

While the court finds the ALJ's *physical* residual functional capacity determination was correct, and the ALJ conducted a thorough *Polaski* analysis and credibility assessment, the court finds the ALJ erred in (1) rejecting the only opinion evidence of record regarding Talkington's mental limitations – that of Dr. Payne; and (2) substituting the ALJ's own inferences regarding the meaning of Dr. Payne's report. The ALJ further erred in failing to develop the record fully and fairly in order to arrive at an accurate determination of how Talkington's mental impairments affect her ability to return to her past relevant work or, if appropriate, her ability to perform in the workplace at all.

### V. CONCLUSION

For the reasons discussed above, the Commissioner's decision is **reversed**, and this case is **remanded** for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g). Upon remand, the Commissioner is directed to further develop the record sufficiently to allow a determination regarding Talkington's mental residual functional capacity and its resulting effect on her ability to work.

**IT IS SO ORDERED.**

**DATED** this 20th day of September, 2005.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT